IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROSE-MARIE NSAHLAI | Case No. 1:21-MJ-318<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Charles W. Sublett, being first duly sworn, hereby affirm and state:

INTRODUCTION AND AGENT BACKGROUND

1. I am currently employed as a Special Agent with Internal Revenue Service-Criminal Investigation (IRS-CI) and have held this position since August 2019. I am currently assigned to IRS-CI's Washington, D.C. post of duty where I investigate complex financial crimes. I have duties that include investigations of, among other things, tax evasion, Bank Secrecy Act (BSA) violations, money laundering, and other financial crimes.

2. I have received 26 weeks of training in general law enforcement and criminal investigations involving violations of the Internal Revenue Code, financial crimes, and money laundering. In addition to my law enforcement training, I am a Certified Public Accountant, Certified Fraud Examiner, and hold a master's degree in Accounting and Information Systems from Virginia Tech. Prior to working for IRS-CI, I served as a Senior Forensic Accountant for Deloitte Financial Advisory Services where I advised federal law enforcement agencies regarding complex third-party money laundering investigations. In the course of my training and experience and in the course of conducting criminal investigations, I have interviewed subjects

and witnesses, conducted physical surveillance, analyzed financial records, traced funds and illegal proceeds, and prepared and executed seizure, search, and arrest warrants.

3. As a federal agent, I am authorized to investigate violations of the Internal Revenue Code, other financial crimes, and money laundering. I am the IRS-CI case agent assigned to the investigation of ROSE-MARIE NSAHLAI ("NSAHLAI").

4. I respectfully submit this affidavit in support of an application for a criminal complaint charging NSAHLAI with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and for an arrest warrant for NSAHLAI, pursuant to Federal Rule of Criminal Procedure 4(a).

5. This affidavit is intended merely to show that there is sufficient probable cause for the requested complaint and arrest warrant. Since this affidavit is submitted for the limited purpose of obtaining the complaint and arrest warrant, I have not set forth each and every known fact pertinent to this investigation and have included primarily those facts that I believe are necessary to establish probable cause. The information provided is based on my personal knowledge and observations during this investigation, information conveyed to me by other officials, law enforcement officers, and my review of records, documents, and other evidence obtained during this investigation.

6. Based on my training and experience and the facts set forth in this affidavit, I submit that there is probable cause to believe that NSAHLAI has engaged in conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.

7. The criminal conduct under investigation relates to a suspected fraud committed in connection with the Paycheck Protection Program ("PPP") administrated by the Small Business Administration ("SBA"). In or around March 2020, Congress passed the Coronavirus

Aid, Relief, and Economic Security ("CARES") Act, of which the PPP was one component. Through the PPP, Congress authorized the award of hundreds of billions of dollars in forgivable loans to small businesses, for the purpose of enabling those businesses to continue to pay salary or wages to their employees. To apply for a forgivable loan under the PPP, a business must submit an application to a participating financial institution. If a PPP loan application is approved, the participating lender funds the PPP loan using its own money. The SBA, in turn, guarantees the repayment of the loan.

8. An applicant seeking a PPP loan is required to disclose to participating lenders, among other things, the applicant's number of employees and average payroll expenses. At the time of the loans under investigation, the applicant also was required to agree to use any funds disbursed through the program only "to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments as specified under the Paycheck Protection Program Rule."

9. As described in more detail below, the government's investigation indicates that NSAHLAI, with the assistance of her now-estranged husband, DIDIER KINDAMBU ("KINDAMBU"), fraudulently applied for and obtained two PPP loans from Bank of America, N.A. ("BOA"), and that the co-conspirators then used the proceeds of those loans, in part, for items unconnected to payroll or any permissible expense.

10. On or about April 3, 2020, KINDAMBU, or someone acting at his direction, submitted a PPP loan application to BOA on behalf of Papillon Holdings, Inc. (At all times relevant to this investigation, the deposits of BOA were insured by the Federal Deposit Insurance Corporation ("FDIC"); BOA therefore constituted a "financial institution" for purposes of 18 U.S.C. §§ 20 and 1344.) That application claimed that Papillon Holdings, Inc. had eighteen full-

time employees with an average monthly payroll of $702,450. As a part of that application process, KINDAMBU, or someone acting at his direction, supplied BOA with an Excel spreadsheet file that purported to be payroll records for employees of Papillon Holdings, Inc. This spreadsheet purported to identify eighteen employees of Papillon Holdings, Inc. and listed total payroll expenses of $7,181,522 for 2019.

11.  There are several indications that these records are false, and that many if not all of the claimed employees are fictitious. First, the spreadsheet claims that Papillon Holdings, Inc. made over $600,000 in unemployment contributions in 2019 to the Commonwealth of Virginia, but the Virginia Employment Commission has no record of any payments being made on behalf of that entity. Second, the spreadsheet uses precisely the same formula to calculate the amount of money allegedly withheld on behalf of each supposed employee. Legitimate payroll records typically reflect varying rates of withholding, as employees often fall into different tax brackets or elect different withholdings or exemptions. The spreadsheet also overstates the amount of Social Security withholdings and contributions that legitimately would have been assessed against employees making the amount of money claimed in the spreadsheet. Third, the spreadsheet claims a total of over $7,000,000 in payroll expenses for Papillon Holdings, Inc. in 2019. But the total cumulative disbursements in 2019 reflected in all accounts identified so far in this investigation held in the name of Papillon Holdings, Inc., was less than $2,500,000. Fourth, the spreadsheet claims that Papillon Holdings, Inc. withheld $ 2,513,543.20 in federal income taxes from its supposed employees for 2019, and further claims that it withheld $128,992.06 in federal income taxes from its supposed employees for the first quarter of 2020. But the IRS has confirmed that, as of September 29, 2020, Papillon Holdings, Inc. had not filed a quarterly payroll return, known as a Form 941, for any quarter in 2019 or 2020, and had not filed

an annual unemployment tax return, known as a Form 940, for 2019 or 2020. (A Form 941 is a quarterly return through which an employer reports the amount of federal income taxes, Social Security taxes, and Medicare taxes withheld on behalf of its employees, and pays those amounts over to the IRS. A Form 940 is an annual unemployment tax return wherein an employer lists, among other things, the total payments it made to its employees for the reported year.)

12. Also on or about April 3, 2020, KINDAMBU, or someone acting at his direction, applied for another PPP loan from BOA, this time on behalf of Papillon Air, Inc. That application represents that Papillon Air, Inc. had twenty-seven full-time employees with an average monthly payroll of $1,980,000. As a part of that application process, KINDAMBU, or someone acting at his direction, later supplied BOA with an Excel spreadsheet file that purported to be payroll records for employees of Papillon Air, Inc. The supporting Excel spreadsheet states that the employees were employed by Papillon Air Inc. and were receiving wages as of March 27, 2020.

13. The evidence indicates that these records also are fraudulent. First, the spreadsheet represents that Papillon Air, Inc. made over $400,000 in unemployment contributions in 2019 to the Commonwealth of Virginia, but the Virginia Employment Commission has no record of any payments being made on behalf of that entity. Second, the spreadsheet uses precisely the same formula to calculate the amount of money allegedly withheld on behalf of each supposed employee and overstates the amount of Social Security withholdings and contributions that legitimately would have been assessed against employees being paid the asserted amounts. As noted above, this is not consistent with legitimate payroll records. Third, the spreadsheet claims a total of over $10,000,000 in payroll and independent contractor expenses for 2019. But the total cumulative disbursements in 2019 reflected in all accounts

identified so far in this investigation held in the name of Papillon Air, Inc., was approximately $800,000. Fourth, the spreadsheet claims that Papillon Air, Inc. withheld $1,806,749 in federal income taxes from its supposed employees for 2019, and further claims that it withheld $451,687.25 in federal income taxes from its supposed employees for the first quarter of 2020. But the IRS has confirmed that, as of September 29, 2020, Papillon Air, Inc. had not filed a Form 941 for any quarter in 2019 or 2020, and had not filed a Form 940 for 2019 or 2020.

14. On or about May 6, 2020, BOA disbursed approximately $2,126,753 in PPP loan funds to a BOA account held in the name of Papillon Air Inc. On or about May 14, 2020, BOA disbursed approximately $375,000 in PPP loan funds to a BOA account held in the name of Papillon Holdings Incorporated. An analysis of bank and other financial and business records shows that, after receiving these proceeds, KINDAMBU spent a substantial portion of the proceeds on items unrelated to payroll, mortgage interest payments, lease payments, or utility payments. For example, bank and mortgage company records show that KINDAMBU used at least $427,627 in fraud proceeds towards the down payment for the purchase of real estate at 43464 Calphams Mill Court, Leesburg, VA 20176, which upon purchase was titled jointly in the name of both KINDAMBU and NSAHLAI. Financial records also show that KINDAMBU used the fraud proceeds towards the purchase of all or part of a Lexus automobile, and all or part of a Cessna 172S aircraft, and numerous other items that are not allowed under the PPP program rules.

15. Financial records show that KINDAMBU also transferred some of the fraud proceeds into an account in the name of "Papillon Air Maintenance," where both he and NSAHLAI are signatories. Bank records show that some of these funds subsequently were spent on payroll for that entity. But records from the Virginia Corporation Commission show that

Papillon Maintenance Services, Inc. was not formed by NSAHLAI until April 28, 2020, after KINDAMBU applied for both loans from BOA. Payroll records from Paychex, a payroll processing company, further show that the payroll disbursements made by KINDAMBU through Papillon Maintenance Services, Inc. were for employees who do not appear to have been hired until June 2020, whose names do not match the suspected fraudulent names in the spreadsheets provided to BOA, and who were being compensated far less than the salaries represented for the suspected fraudulent spreadsheets.

16. On or about October 16, 2020, KINDAMBU was charged by criminal complaint with one count of bank fraud, in violation of 18 U.S.C. § 1344. *See United States v. Didier Kindambu*, 1:20-mj-286 (E.D. Va.), Dkt. No. 1.

17. On or about October 20, 2020, I arrested KINDAMBU pursuant to an arrest warrant that had issued on the criminal complaint. After being arrested, KINDAMBU was advised of his *Miranda* rights and agreed to speak with investigators. During that interview, which was audio-recorded, KINDAMBU made numerous false statements to investigators, including, for example, that he had used funds from outside the United States to purchase the Calphams Mill Court property, and that he had not used the PPP loan proceeds to pay for personal expenses.

18. In or about September 2020, in a state investigation unrelated to this case, KINDAMBU was charged in Loudoun County Juvenile and Domestic Relations Court with felony strangulation and misdemeanor assault on a family member. NSAHLAI is the alleged victim in that case.

19. On or about October 20, 2020, other investigators also conducted a non-custodial interview of NSAHLAI. During that interview, NSAHLAI claimed, among other things, that:

(a) she was not involved in the day-to-day operations of Papillon Air, Inc., and knew very little about Papillon Holdings, Inc.; (b) that Papillon Air, Inc. could have had between 10 and 50 employees; (c) she cautioned KINDAMBU that proceeds from the PPP loan should not be used to purchase the Calphams Mill Court property, that she did not want any part of the transaction if he used PPP proceeds for that purpose, and that KINDAMBU assured her that the money for the down payment came from a different source; and (d) at one point she helped KINDAMBU use BOA's online portal for submitting PPP loan applications, but claimed that she was not otherwise involved in the application, that all of the information submitted to BOA came from KINDAMBU, and that she was not involved in preparing any spreadsheets submitted to BOA.

20.     On November 18, 2020, KINDAMBU was indicted with two counts of bank fraud, in violation of 18 U.S.C. § 1344, nine counts of unlawful monetary transactions, in violation of 18 U.S.C. § 1957, and one count of false statements, in violation of 18 U.S.C. § 1001, in connection with the above-described scheme. *See United States v. Didier Kindambu*, 1:20-CR-260 (E.D. Va.), Dkt. No. 23.

21.     On January 28, 2021, KINDAMBU pled guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344, for his role in the above-described scheme. *See United States v. Didier Kindambu*, 1:20-CR-260-RDA (E.D. Va.), Dkt. No. 39. KINDAMBU admitted in his signed statement of facts that, among other things, he "submitted and caused to be submitted" the two fraudulent loan applications described above, that the applications falsely claimed payroll expenses that did not exist, and that in truth, Papillon Holdings, Inc. and Papillon Air, Inc. had "few if any payroll expenses." *Id*. Dkt. No. 40.  KINDAMBU further admitted that he misappropriated the PPP loan proceeds by spending a substantial portion of those funds on unauthorized expenses, including to pay for the down payment towards the purchase of the

Calphams Mill Court property.  *Id*.

22.     KINDAMBU has agreed to cooperate with law enforcement as a part of his plea agreement.  KINDAMBU also has provided written consent to law enforcement to search his iPhone, his laptop, and his email account, and has waived in writing any spousal testimonial privilege and any confidential communication privilege he may have regarding communications with NSAHLAI.

23.     Pursuant to this cooperation agreement, KINDAMBU and his counsel also agreed to provide law enforcement with a copy of a recorded conversation covertly made by KINDAMBU's adult daughter of a conversation she had with her step-mother, NSAHLAI, on or about September 24, 2020.  According to the adult daughter, she and her minor brother, who are both from a prior marriage of KINDAMBU's, reside at the Calphams Mill Court property, while NSAHLAI continues to reside at another location with NSAHLAI's children from a prior marriage.  The adult daughter advises that she covertly recorded the conversation when NSAHLAI came to the Calphams Mill Court property.  At various points in that recording, NSAHLAI made references to her involvement in the PPP fraud scheme, including the following:

> i. In reference to the funds used for the down payment for purchase of the Calphams Mill Court property, "Did your dad tell you that I got $2.5 million from the government for loans that he has been using around?" NSHALAI also stated that she obtained the financing for the house because KINDAMBU would not have been approved.
>
> ii. "You say it was your dad's money, your dad should be careful, we have all the evidence. Your dad could not have bought this house without me. He's not a citizen, he is not a resident. But you do not understand where the money came from, sometimes you guys talk money but you don't know where the money come from, even your mom does not know where the money comes from. Who made it happen?"

  iii. "I have done all these things. By the way, the loan, he says he is going to give it back, he is not going to give it back, that money is going to be scot-free because of how I did it."

  iv. "Let's forget about that. He does not even give me an allowance for all I did. Did you know your dad doesn't even do it? He told me he gives me a job. Who does that job? Your dad has never logged onto a computer, he doesn't know anything about a job."

  v. "I work everything, I worked for the loan, you saw how I was going crazy."

  vi. "How can you call the cops on your wife? And tell her to leave a house she made happen."

24. A preliminary search of KINDAMBU's iPhone, conducted pursuant to his written consent, has also identified email communications that reflect NSAHLAI's knowing participating in the PPP loan fraud scheme. For example, on or about April 6, 2020, NSAHLAI sent an email from rnsahlai@yahoo.com to didier@kindambu.com. The email includes a link to a YouTube video regarding the PPP and Bank of America, N.A. In that email, NSAHLAI stated:

"Hello Didier,

Saw this. To get our numbers, we grossly exaggerated monthly. The first, Papillon we did the monthly was approx. $700,000 to get a loan of $1.7 million.

The next I went up close to what [Individual A] suggested $5 million loan. Which meant the numbers were super high.

The loan is your monthly * 2.5

I've asked [Individual A] locate your application to get exact information. I recall what was done for the most part.

Offset can be done with Contractor issued 1099 we can claim creates the discrepancy. Can indicate was included in payroll."

25. NSAHLAI referenced loan amounts of $1.7 million and approximately $5 million. While the loans obtained for Papillon Holdings, Inc. and Papillon Air, Inc. were $375,000 and $2,126,753, respectively, information from the SBA and Bank of America, N.A.

shows that the initial applications for the entities requested $1,496,155 for Papillon Holdings, Inc. and $4,950,000 for Papillon Air, Inc.

26. An additional email was obtained from rnsahlai@yahoo.com to didier@kindambu.com sent on or around April 8, 2020. That email contains what appears to be a copy of the fraudulent spreadsheet submitted to BOA in support of Papillon Air, Inc.'s PPP loan application.

27. I also uncovered a WhatsApp instant messaging thread on KINDAMBU's iPhone with NSAHLAI. NSAHLAI made several references to her involvement in the fraud including:

> i. "At this point, we'll create the payroll reports for the periods stated by employee. SBA us not IRS so if you're ready to take a leap of faith and a chance, we'll figure it out." NSAHLAI went on to correct "us" to "is" saying, "SBA is not IRS".
>
> ii. "I'll generate the reports from free templates. Current: figure how payments can be justified. Future: We know the risks, lay low on SBA initiatives, do taxes etc."
>
> iii. "The report is a lot and not even 5% done since 7. I need to manually figure fed tax, state, Medicare etc plus the spreadsheet has a macro which was disabled creating formula issues."
>
> iv. "I'm finishing PA 2019 and hope to do 1st qtr 2020…" Based on my knowledge of this investigation, I suspected "PA" is an abbreviation for Papillon Air.

28. I also have examined the metadata embedded in the fraudulent spreadsheets submitted to BOA in support of the Papillon Air, Inc. and Papillon Holdings, Inc. applications. The metadata embedded in the spreadsheet submitted in support of the Papillon Holdings, Inc. application shows that the spreadsheet was last modified by "Rose-Marie Nsahlai." The metadata embedded in the spreadsheet submitted in support of the Papillon Air, Inc. application shows that the spreadsheet was last modified by "DK." The "Company" listed in the metadata is "HHS/ITIO." HHS/ITIO is a common abbreviation for Health and Human Services ("HHS")

Information Technology Infrastructure and Operations. Currently, and at the time of the fraudulent applications, NSAHLAI was employed at HHS's Office of the National Coordinator for Health Information Technology.

29. Based on the forgoing, as well as the training and experience of other law enforcement agents with whom I have spoken and my own experience, I respectfully submit that there is probable cause to believe that ROSE-MARIE NSAHLAI conspired to commit bank fraud, in violation of 18 U.S.C. § 1349.

Respectfully submitted,

*Charles W. Sublett*

Sublett Charles W
Digitally signed by Sublett Charles W
Date: 2021.09.22 14:29:26 -04'00'

Charles W. Sublett
Special Agent
IRS-CI

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1 via telephone on September 23, 2021.

Digitally signed by Michael S. Nachmanoff
Date: 2021.09.23 11:59:55 -04'00'

Honorable Michael S. Nachmanoff
United States Magistrate Judge

12